IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VISIT HEALTHCARE | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Judge: |
| ANTHONY J. SGAMBATI | ) | |
| | ) | |
|     And | ) | |
| | ) | COMPLAINT WITH JURY |
| | ) | DEMAND ENDORSED |
| | ) | HEREON |
| | ) | |
| CORB, LLC | ) | |
| | ) | |
| | ) | |
|     Defendants. | ) | |

## COMPLAINT

Plaintiff, Visit Healthcare, by and through its undersigned counsel, for its complaint against ANTHONY J. SGAMBATI ("Sgambati") and CORB, LLC, states as follows:

### JURISDICTION AND VENUE

1. Jurisdiction is proper, pursuant to 28 U.S.C. §1332, based on the diversity of the parties. Plaintiff, Visit Healthcare, is a corporation organized under the laws of the State of California. Defendant Sgambati is a resident of Ohio. Defendant CORB, LLC is a limited liability company organized under the laws of the State of Ohio. The amount in controversy exceeds $75,000.

2. Venue is proper in the Federal District Court for the Northern District of Ohio as Sgambati is a resident of the Northern District of Ohio, with a principal

1

place of residence at 4609 Beach Road, Medina, Medina County, Ohio, and the case involves conduct that occurred within the Northern District of Ohio.

## PARTIES

3. Plaintiff Visit Healthcare ("Visit") is a California Corporation with its principal place of business at 20 South Santa Cruz Avenue, Suite 300, Los Gatos California. Visit is currently the sole shareholder of TRBS Consulting, LLC ("TRBS").

4. Sgambati is the spouse of Tracey Burns Sgambati ("Burns"), who until January 2021 was the sole shareholder of TRBS. In January 2021, Burns began selling her shares in TRBS to Visit. At all relevant times, Sgambati acted as Burns' agent in the negotiation of the sale of TRBS to Visit. Until April 2021, Sgambati was also an employee of the Center for Molecular Cancer Diagnostics, Inc. d/b/a CoreBio Labs ("CMCD").

5. Defendant CORB, LLC, is an Ohio Limited Liability Corporation formed on December 28, 2020, for the purposes of receiving the proceeds of the sale of TRBS to Visit. At the Direction of Sgambati, Visit paid the funds to purchase TRBS to Defendant CORB, LLC.

## RELEVANT NON-PARTIES

6. Until January 2021, Burns was the sole shareholder of TRBS. After negotiations undertaken by Sgambati, Burns sold her interest in TRBS to Visit in a series of four transactions commencing in January 2021 and ending in August 2021. On information and belief, Burns is also the sole shareholder of CORB, LLC.

7. Benjamin Fanger ("Fanger") is the Founder, Chairman of the Board, and partial owner of Visit. Together with Visit officer Olympia Bliss ("Bliss"), Fanger acted as Visit's agent in the negotiations with Sgambati to purchase TRBS.

8. At all relevant times, Bliss was the Chief Operating Officer ("COO") of Visit and, as an agent of Visit, participated in the negotiations with Tony Sgambati to purchase TRBS.

## FACTUAL BACKGROUND

9. CMCD is an Ohio corporation with its principal place of business at 7956 Tyler Boulevard, Mentor, Ohio. CMCD operates a clinical laboratory in the State of Ohio under the tradename CoreBio Labs.

10. TRBS owns 5,620 shares of CMCD Class A voting stock, which at all relevant times constituted 22.48% of the issued and outstanding shares of CMCD.

11. At all relevant times, TRBS's sole function was as a shareholder of CMCD. Other than holding 22.48% of CMCD, TRBS does not conduct any other business or hold interest in any other entities. TRBS does not have any operating revenue, and its entire value is its ownership stake in CMCD.

12. Until April 2021, Sgambati was an employee of CMCD working in a sales capacity to develop client leads for the laboratory.

13. Visit is a healthcare company that, among other things, provides COVID-19 testing and vaccinations to clients throughout the United States. Beginning in 2020, Visit utilized CMCD's lab to process COVID-19 testing specimens

for Visit's clients around the country. It was through this vendor-client relationship with CMCD that Visit first became acquainted with the Sgambati, Burns, and TRBS.

14. Fanger has known CMCD's Chief Executive Officer and Clinical Consultant, Dr. Wissam Khoury ("Khoury"), since 2015 when Fanger founded Visit. In 2017, Fanger and Khoury discussed the possibility of opening laboratories together because Visit would need lab processing services and Khoury, as a physician, had laboratory experience. Khoury later acquired an ownership interest in CMCD, independent of the prior conversations with Fanger. Visit became a client of CMCD in the summer of 2020 through Fanger's longstanding relationship with Khoury.

15. On or around October 2020, Fanger expressed to Khoury that Visit was interested in becoming a partial owner of CMCD.

16. Upon learning that Visit was interested in acquiring a partial ownership in CMCD, Sgambati, acting as an agent for his wife and TRBS's sole owner (Burns), reached out to Fanger and made a pitch to Visit: rather than purchase an interest in CMCD from CMCD, Visit should instead purchase TRBS from Burns as a means of acquiring its desired shareholder interest in CMCD.

17. Visit, through its agents Fanger and Bliss, negotiated with Sgambati regarding a potential sale of TRBS to Visit. Fanger served as the primary negotiator for Visit,Sgambati acted as agent for TRBS' sole shareholder, Burns during the negotiations.

18. In negotiations, Sgambati contended that a discounted valuation of CMCD was $7 million, and TRBS's 22% share of CMCD should be valued at $1.57 million.

19. From the outset, Visit disagreed with this proposed valuation. Fanger told Sgambati the fair market value of small businesses like CMCD is generally three times the company's EBITDA (annual profitability), and based on CMCD's 2020 financials, a fair valuation of CMCD was no more than $4 million. Fanger further argued that the actual valuation should be much lower because more than two thirds of CMCD's 2020 profit was derived from COVID-19 testing revenue, a one-time windfall event that should not be included in a valuation for acquisition purposes. Fanger argued an appropriate valuation for CMCD would be approximately $1.33 million, representing approximately three times CMCD's non-COVID 2020 profit. Using a $1.33 million valuation for CMCD, the value of TRBS's 22% share of CMCD would be approximately $300,000, which is what Fanger and Bliss told Sgambati Visit would be willing to pay.

20. In conversations with Fanger and Bliss in November 2020, Sgambati acknowledged his proposed $7 million valuation for CMCD constituted a premium over a typical valuation, but argued such premium valuation was appropriate. He contended that concerns about diminishing profitability post-pandemic were unfounded, he could use his position as a CMCD employee to ensure ongoing profitability, and he had connections with non-COVID business he would bring in for CMCD across the country. Sgambati also told Visit that, contrary to Fanger's

5

calculation of CMCD's value, there were buyers in the market who valued the company higher than $7 million, including one specific buyer he was talking to that was planning an immanent purchase of CMCD for $12 million.

21. In a phone call on or around November 23, 2020, Fanger and Bliss told Sgambati they were not interested in purchasing TRBS at Sgambati's proposed price of $1.57 million, because his estimated valuation of the company was inflated. Fanger and Bliss reiterated that a fair market valuation of TRBS would be derived by calculating approximately three times CMCD's 2020 non-COVID related profits, or approximately $300,000.

22. During that telephone call on or around November 23, 2020, Fanger and Bliss told Sgambati that Visit is not a venture capital fund and would only purchase a company at a significant discount. Fanger and Bliss told Sgambati that Visit would only be willing to acquire TRBS at the price Sgambati prosed if either (1) Visit became convinced that the post-pandemic profitability could be sustained at 2020 profit levels, or (2) there was an identified buyer of CMCD that was offering to purchase CMCD at a valuation substantially higher than Sgambati's $7 million value. Fanger and Bliss then proposed that, since neither of those conditions were met, they should negotiate based on a valuation of three times CMCD's non-COVID 2020 profit, and that Visit would purchase TRBS for approximately $300,000.

23. Burns did not accept Visit's offer. Instead, Sgambati began a campaign to try to falsely inflate the purchase price for TRBS.

6

24. Conversations between Visit and Sgambati continued throughout December 2020, as Fanger and Bliss continued to express their view that a $7 million valuation of CMCD (and therefore a $1.57 million valuation of TRBS) was inflated. In response to Visit's expressed concerns about anticipated revenue decreases once the COVID-19 testing peak passed, Sgambati falsely represented to Fanger and Bliss in a phone call in early December 2020 that he had taken steps to develop sales prospects he would close for the lab that would allow CMCD to successfully transition to a post-COVID environment without losing revenue, including "next generation" sequencing, and gastroenterology PCR testing, and toxicology testing.

25. In December 2020, Sgambati again falsely represented to Visit that he had an immanent buyer who had offered to purchase CMCD for $12 million. Sgambati told Fanger and Bliss by phone that a group of three experienced investors from California and Colorado had approached him about purchasing a laboratory engaged in COVID-19 work. Sgambati told Fanger and Bliss he introduced the "three gentlemen" to CMCD, and the investors were already preparing their letter of intent to purchase CMCD for $12 million.

26. On December 15, 2020, Sgambati followed the phone call with an email to Fanger and Bliss, reiterating that he had been approached by "a team of three gentlemen" with "impressive successes in the pharma and other industries" who wished to purchase CMCD and become passive owners and Board members, while working with and shoring up the existing CMCD team to continue running day to day operations. In the December 15th email, Sgambati stated he had had a meeting with

7

Khoury, and CMCD's Chief Operating Officer, Fonnie Hui-Morris ("Morris"), and that "Wiss [Khoury] and Fonnie agreed to sell the company for 12M plus all cash on hand at the time of sale (currently 2.2M)." In the December 15th email, Sgambati further falsely represented to Visit that the sale would close by January 31, 2021.

27. Sgambati told Fanger and Bliss that based on the pending offer to purchase CMCD for $12 million, the appropriate valuation of TRBS was actually substantially more than Sgambati's previously-proposed $1.57 million, and was in fact more like $2.7 million. In the December 15th email, Sgambati told Visit that despite the imminent $12 million offer raising the fair market price of TRBS, Burns remained willing to sell TRBS to Visit based on the $7 million valuation Sgambati originally proposed out of a desire to get the deal done quickly because "we [Tony and Tracey Sgambati] are up against a deadline for some nasty notes we owe to companies that didn't survive Corona," but that if Visit wanted to realize the value that would derive from the sale of CMCD it needed to buy TRBS quickly.

28. Visit relied on Sgambati's representations that there was a pending transaction by the buyers to purchase CMCD at $12 million, which, when completed, would result in proceeds to TRBS in excess of $2.7 million.

29. On December 21, 2020, Sgambati communicated by text message with Fanger as part of his continued efforts to get Visit to purchase TRBS quickly. In that text message, Sgambati reiterated his pitch that it would be better for Visit to purchase TRBS than acquire an interest in CMCD through other means because such

8

sale it would avoid the need to update CMCD's corporate paperwork and Medicaid registrations in the various states where CMCD did business.

30. Also via text message on December 21, 2020, as part of his efforts to induce Visit to purchase TRBS, Sgambati told Fanger that Visit could realize additional financial gains from buying TRBS by working with CMCD to generate additional revenue streams by opening a new laboratory in Chicago, where Visit had COVID-19 testing clients that at the time were not happy with the slow turnaround times from Visit using the out of state lab in Ohio (CMCD). Fanger responded that opening a lab in Chicago with CMCD was an option Visit was considering. Sgambati responded via text message saying it was a "great idea."

31. On January 4, 2021, two weeks after Sgambati falsely told Visit there was a pending $12 million offer for CMCD, Visit and Burns executed a purchase and sale agreement whereby Visit bought all of Burns' shares in TRBS for a total of $1,573,600. This purchase price was approximately $1.2 million more than Visit's initial offer of $300,000.

32. At the direction Sgambati, Visit deposited the funds for the purchase, in a series of four transfers in 2021, to an account held by Defendant CORB, LLC.

33. Sgambati's representation that there was a buyer who had offered to purchase CMCD at a valuation of $12 million, and was planning to close by January 31, 2021, was false. There was no such offer to purchase CMCD in place, and no such serious immanent buyer. The "three gentlemen" that Sgambati told Fanger and Bliss

9

he was actively negotiating with to buy CMCD never materialized and never provided a letter of intent as Sgambati falsely represented they would.

34. In fact, since Visit's purchase of TRBS, no buyer has expressed interest in CMCD. Furthermore, contrary to Sgambati's prior assurances, after the sale of TRBS, he never brought in any material non-COVID business that he falsely claimed was in process.

35. Sgambati, as agent for TRBS's then-owner Burns, intentionally and with malice misrepresented the existence of the offer, and the valuation of CMCD made by the "buyers," with the intent that Visit would rely on that false representation in assessing TRBS's fair market value as part of the parties' ongoing negotiations regarding the sale of TRBS to Visit.

36. Visit did, in fact, rely on Sgambati's misrepresentations regarding the pending offer and the "market valuation" of TRBS in arriving at its final purchase price for TRBS, which was more than five times its original offer of $300,000.

37. Visit also relied on Sgambati's false representation that CMCD was positioned to engage "next generation" sequencing, gastroenterology PCR testing, and toxicology testing, and that he could bring in this business to sustain CMCD's profit beyond COVID-19 testing.

38. Sgambati did not have or continue to close a pipeline of clients and non-COVID business designed to ensure a successful transition to a post-COVID revenue model. In fact, soon after the sale of TRBS, Sgambati destroyed his relationship with CMCD's management by engaging in reckless and dishonest misconduct which, upon

information and belief, included physical threats directed at Morris, attempts to covertly raise CMCD prices and skim excess revenues, and subverting CMCD's relationships with employees and business partners.

39. On information and belief, the above-referenced misconduct contributed to CMCD terminating Sgambati's employment.

40. As a result of Sgambati's knowing misrepresentations, Visit suffered economic damages by substantially overpaying money to Defendant CORB, LLC, in exchange for sole ownership of TRBS.

## COUNT I
## UNJUST ENRICHMENT

41. Plaintiff restates, realleges and incorporates each of the allegations set forth in the previous paragraphs as if fully written herein.

42. Sgambati, acting as agent of TRBS' then-owner, Burns, negotiated the sale of TRBS to Visit, and directed Visit to deposit the funds for the purchase in an account owned by Defendant CORB, LLC.

43. Sgambati knew Visit offered its purchase price for TRBS based on Sgambati's false representations about a $12 million offer to purchase CMCD, and false representations about actions already taken and to be taken by Sgambati in his capacity as employee of CMCD to secure new lines of business in a post-COVID environment.

44. Defendants had a reasonable opportunity to prevent Visit from purchasing TRBS at a falsely inflated value.

45. Defendant CORB, LLC and Burns benefitted and were unjustly enriched as a result of the misrepresentations of Burns' agent, Sgambati, that induced Visit to pay above-market value for TRBS.

## COUNT II
## FRAUDULENT INDUCEMENT

46. Plaintiff restates, realleges, and incorporates each of the allegations set forth in the previous paragraphs as if fully written herein.

47. Sgambati, acting as agent of Burns, misrepresented to Visit that there was a pending offer to purchase CMCD for $12 million, with the intent that Visit would rely on that information in arriving at its offer price for TRBS.

48. Sgambati further misrepresented to Visit that he had immediate non-COVID revenue sources for CMCD and would continue to, in his capacity as CMCD employee, take steps to transition CMCD to a post-pandemic environment to ensure that revenues would continue at 2020 levels even as COVID-19 testing business decreased, with the intent that Visit would rely on that information in arriving at its offer price for TRBS.

49. Visit justifiably relied on Sgambati's misrepresentations in deciding to offer $1.57 million to purchase TRBS from Burns .

50. Sgambati knew that Visit agreed to its purchase price for TRBS as a result of Sgambati's false representations about a $12 million offer to purchase CMCD and new lines of business to replace decreasing COVID-related revenue.

51. Visit's decision to pay over $1.5 million for TRBS was induced by Sgambati's false representation of the market value of TRBS.

12

52. Visit was harmed when it paid over $1.2 million more for TRBS than it had originally offered, based on its reliance on Sgambati's false representations.

WHEREFORE, Plaintiff preys and demands:

I. Count I: Judgment against Defendant Anthony Sgambati and Defendant CORB, LLC, and disgorgement of all profits obtained through the sale of TRBS over Visit's original offer price of $300,000, which constitutes an amount in excess of $75,000.

II. Count II: Judgment against Defendant Anthony Sgambati and Defendant CORB, LLC, and an award of compensatory damages in an amount equal or greater to the amount Visit paid for TRBS over its original offer price of $300,000, which constitutes an amount in excess of $75,000.

III. Count II: Punitive damages against Defendant Anthony Sgambati in the amount of $1,500,000.

IV. Costs of bringing and maintaining this action, including reasonable attorney fees, and for such other and further relief as the Court deems just and equitable in these circumstances.

By: /s/ Max E. Dehn
Max E. Dehn (0079600)
Yao Liu (0092485)
Madilyn M. Bell (0098386)
Cavitch Familo & Durkin
1300 East Ninth Street, 20th Floor
Cleveland, OH 44114
Phone: (216) 621-7860
Fax: (216) 621-3415
Email: mdehn@cavitch.com
yliu@cavitch.com
mbell@cavitch.com

Kathleen Hill (*pro hac vice* motion pending)
Salvatore Prescott Porter & Porter, PLLC
1010 Davis Street
Evanston, IL 60201
(312) 283-5711
hill@sppplaw.com

          Attorneys for Plaintiff Visit Healthcare

**<u>JURY DEMAND</u>**

Plaintiff demands that this case be tried before a jury of the maximum number allowed by law.

          /s/ Max E. Dehn
          Max E. Dehn (0079600)